**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| JOSEPH LOPEZ, individually and on behalf of all others similarly situated, | |
| Plaintiff, | CASE NO.: 3:25-cv-378 |
| v. | **CLASS ACTION COMPLAINT** |
| GREYSTAR REAL ESTATE PARTNERS, LLC, d/b/a "Greystar," a limited liability company; | **JURY TRIAL DEMANDED** |
| GREP GENERAL PARTNER, LLC, d/b/a "Greystar," a limited liability company; | |
| GREYSTAR MANAGEMENT SERVICES, LLC, d/b/a "Greystar," a limited liability company; | |
| GREYSTAR RS NATIONAL, LLC, d/b/a "Greystar," a limited liability company; and | |
| GREP TEXAS, LLC, d/b/a "Greystar," a limited liability company, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

1.     Plaintiff Joseph Lopez ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendants GREYSTAR REAL ESTATE PARTNERS, LLC, GREP GENERAL PARTNER, LLC, GREYSTAR MANAGEMENT SERVICES, LLC, GREYSTAR RS NATIONAL, LLC, GREP TEXAS, LLC (collectively referred to as "Greystar") to obtain damages, restitution, and injunctive relief from Defendants. Plaintiff makes the following allegations upon personal knowledge, the investigation of counsel, facts that are a matter of public record, and information and belief as to all other matters.

## **NATURE OF THE ACTION**

2.      This class action arises out of Greystar's deceptive, unfair, and illegal "Utility Admin Fees" assessed against tenants since at least 2019 to the present.

3.      In January 2025, the Federal Trade Commission (the "FTC") and the State of Colorado filed a complaint against Greystar alleging that, since at least 2019, Greystar has "used deceptive advertising to entice consumers into applying for rental housing, and then bilked those consumers out of hundreds of millions of dollars by charging 'Hidden Fees' (mandatory, fixed fees that are not included in the advertised price) for itself and its landlord clients."[1] In other words, Greystar conceals the real price of leasing its units from price sensitive consumers and only reveals those Hidden Fees to consumers in lengthy lease agreements, after consumers have dedicated significant time to the application process, paid expensive application fees, and sometimes given up prior living arrangements. (The "FTC Allegations".)

4.      In addition to the FTC Allegations, Plaintiff has also found that many Hidden Fees, labelled as Utility Admin Fees, are never disclosed to consumers (until consumers are billed for them) or provided for in Greystar's lease agreements. In other words, many (if not all) of the Utility Admin Fees that Greystar charges their tenants on a monthly basis are not authorized or even mentioned in Greystar's lease agreements with tenants.

5.      Each month, Greystar assesses small "Utility Admin Fees" of approximately $1.00-$5.00 (many of which are not provided for in Greystar's lease agreements) in hopes that these charges will go unnoticed and uncontested by tenants who have limited time and knowledge of their lengthy and complicated lease agreements.

---

[1] *FTC, et al. v Greystar, et al.*, Case No. 1:25-cv-00165, ECF No. 1.

6.      Many, if not all, of these Utility Admin Fees serve no legitimate purpose but to increase Greystar's profits and inflate its bottom line at tenants' expense.

7.      Plaintiff brings this action against Greystar seeking redress for its unlawful conduct and asserting claims for: (i) breach of contract; (ii) violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"); (iii) unjust enrichment; and (iv) declaratory relief.

8.      Plaintiff seeks remedies including, but not limited to, compensatory damages, nominal damages, and equitable and injunctive relief.

## PARTIES

9.      Plaintiff Joseph Lopez is an individual and citizen of the State of Texas residing in the city of Dallas, Texas.

10.     Defendant Greystar Real Estate Partners, LLC ("GREP LLC"), also doing business as "Greystar," is a Delaware corporation with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403. GREP LLC is a multi-family rental property owner, developer, and manager, with offices located across the United States. Alongside Defendant GREP General Partner, LLC, and through its subsidiaries, GREP LLC manages rental properties across the United States. It conducts its property management business through a web of subsidiaries, including Defendants Greystar Management Services, LLC, and Greystar RS National, LLC. At all times material to this Complaint, GREP LLC has advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States.

11.     Defendant GREP General Partner, LLC ("GREP General Partner"), also doing business as "Greystar," is a Delaware limited liability company with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403. At times material to this

Complaint, through its role as general partner in Greystar Management Services, LP (predecessor to Greystar Management Services. LLC) and other Greystar-related limited partnerships, GREP General Partner has advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States.

12.    Defendant Greystar Management Services, LLC ("GS Management Services"), also doing business as "Greystar," is a Delaware limited liability company with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403. GS Management Services is a subsidiary of GREP LLC. At times material to this Complaint, GS Management Services operated as Greystar Management Services, LP, a limited partnership, in which GREP LLC held a 99 percent interest and GREP General Partner owned a 1 percent interest as general partner. At all times material to this Complaint, GS Management Services has advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States. Together with Defendant Greystar RS National, LLC, and through its subsidiaries, GS Management Services acts as property manager for over 800,000 rental units nationwide (including apartments and beds in student housing properties). At all times material to this Complaint, GS Management Services has controlled the acts and practices of its subsidiaries described below and approved of or benefited from such subsidiaries' acts and practices at issue in this Complaint.

13.    Defendant Greystar RS National, LLC ("RS National"), also doing business as "Greystar," is a Delaware limited liability company with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403. RS National is a wholly owned subsidiary of GREP LLC. At all times material to this Complaint, RS National has advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to

consumers in this District and throughout the United States. Together with Defendant GS Management Services, and through its subsidiaries, RS National acts as property manager for over 800,000 rental units nationwide (including apartments and beds in student housing properties). At all times material to this Complaint, RS National has controlled the acts and practices of its subsidiaries described below and approved of or benefited from such subsidiaries' acts and practices at issue in this Complaint.

14. Defendant GREP Texas, LLC ("GREP Texas"), also doing business as "Greystar," is a limited liability company with its principal place of business at 600 E. Las Colinas Boulevard, Suite 2100, Irving, Texas 75039. Upon information and belief, GREP Texas is a wholly owned subsidiary of Defendant GS Management Services. GREP Texas contracts directly with property owners to manage rental properties located in the State of Texas. As part of its management responsibilities, and at all times material to this Complaint, GREP Texas has advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States.

## COMMON ENTERPRISE

15. Defendants have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below. Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, and office locations, and unified advertising and internal operating policies and procedures. Because these Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value

of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed

class, and at least one member of the class is a citizen of a state different from that of Defendants.

17.    The Court has general personal jurisdiction over Defendants because, personally or

through their agents, Defendants operate, conduct, engage in, or carry on businesses or business

ventures in this State; they are registered with the Secretary of State as a corporation in this State;

they maintain their headquarters in this State; or committed tortious acts in this State.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district

within which Defendants are headquartered and/or have the most significant contacts.

## FACTUAL ALLEGATIONS

### *Defendants' Business*

19.    Founded in 1993, Greystar brands itself as "The Global Leader in Rental Housing"

providing "end-to-end property management services for residential housing, apartment homes,

furnished corporate housing, and mixed-use properties incorporating retail space." As of January

1, 2025, Greystar manages more than "1 million multifamily units and student beds" globally.[2]

20.    Greystar asserts that it "ranks first among the Top 50 US Apartment Managers

according to the 2021 National Multifamily Housing Council."[3]

21.    Greystar also promotes itself as the "#1 owner" of rental apartments in the United

States. According to NMHC's 2024 rankings, which are based on data submitted by property

owners and define ownership as "exercis[ing] effective control over the asset," Greystar owns over

100,000 residential rental units nationwide. The company is also actively involved in the

construction and development of apartment complexes both in the United States and globally.

---

[2] https://www.greystar.com/business-services/property-management (last accessed Feb. 5, 2025).
[3] *Id.*

22.     On its website, Greystar boasts that it has over $78 billion in assets under its management.[4]

23.     Greystar promotes its analytics and operational consistency, including standardized operating procedures and economies of scale, as a unique benefit of hiring Greystar as a property manager.

24.     Greystar provides property management services for rental properties it owns through its subsidiaries and joint ventures, as well as for properties owned by other individual and corporate landlords (rental properties managed by Defendants, whether or not owned by Greystar, are collectively referred to as "Greystar Managed Properties").

25.     When a property owned by Greystar is involved, one of Greystar's regional property management subsidiaries will typically enter into an agreement to provide services to the Greystar subsidiary holding the property title.

26.     Defendants enter into property management agreements ("PMAs") with the owners of all Greystar Managed Properties. Where properties are owned by Greystar, Defendants execute PMAs with the relevant Greystar subsidiary or holding company holding the property title. The PMAs outline Greystar's duties to the property owners, including Greystar's responsibility for leasing, marketing, tenant relations, and day-to-day operations at the subject property. Greystar's PMAs with Greystar-owned properties do not vary significantly from its PMAs with properties owned by third parties.

27.     Greystar offers a wide range of property management services to its clients. Pursuant to the PMAs, Greystar is generally responsible for:

        a.     advertising available rental units;

---

[4] https://www.greystar.com/ (last accessed Feb. 5, 2025).

b.      ensuring the information displayed on property websites is accurate;

c.      communicating with current and prospective tenants;

d.      leasing rental units to qualified tenants;

e.      billing tenants and collecting payments;

f.      marketing properties and maintaining property websites;

g.      hiring and training all on-site personnel at the property;

h.      entering into contracts with third-party service providers as the property owner's agent;

i.      maintaining apartment units and property premises in a habitable condition;

j.      developing an annual budget for each property and submitting quarterly or annual reports to property owners; and

k.      ensuring the collection of tenants' monthly payments.

28.     As property manager, Greystar is responsible for all tenant relations on behalf of the property owner. In most circumstances, Greystar serves as the primary point of contact for consumers interested in renting a unit at Greystar Managed Properties and for tenants residing in those properties.

29.     In exchange for these services, property owners generally pay Greystar the greater of a flat fee or a percentage of the Greystar Managed Property's gross rental revenue. Depending on the specific terms of the agreement between Greystar and the property owner, the calculation of the gross rental revenue may include all nonrefundable amounts collected from tenants, including any Hidden Fees charged to tenants.

*Greystar's Illegal Utility Admin Fees*

30.    Upon information and belief, all Greystar Managed Properties utilize the same or substantially similar form lease terms and policies, with only minor variations ("Form Lease").

31.    The Form Lease is a contract of adhesion consisting of boilerplate terms and provided to tenants on a take-it-or-leave-it basis.

32.    As a result of the standardized language of the Form Lease, all Greystar tenants are subject to essentially identical lease terms regardless of where they reside.

33.    Upon information and belief, Greystar's billing practices are substantially similar across Greystar Managed Properties.

34.    Upon information and belief, Greystar attempts to collect Utility Admin Fees and other junk and hidden fees not authorized by the Form Lease from tenants across all Greystar Managed Properties.

35.    Each month, Greystar assesses small Utility Admin Fees of approximately $1.00-$5.00. Greystar keeps the fees relatively minimal with the intent that they will go unnoticed and uncontested by tenants. Greystar capitalizes on the likelihood, that tenants, who often have limited time and understanding of the detailed terms within their lease agreements, will be less inclined to question or dispute the charges.

36.    Often, a single, monthly rental will contain multiple Utility Admin Fees.

37.    Each month, Greystar sends and publishes bills and "balance" notices to tenants representing that Utility Admin Fees are due to be paid by tenants pursuant to the terms of the tenants' lease agreements with Greystar.



38.     Greystar's Form Lease does not provide for many, if not all, of these Utility Admin Fees.

39.     Upon information and belief, Greystar refuses to remove Utility Admin Fee charges, even upon the protest of tenants, and pursues the Utility Admin Fees even through collections actions up to and including eviction causing tenants not only economic damages but mental anguish.

40.     Upon information and belief, it is Greystar's policy to charge multiple Utility Admin Fees regardless of the terms of Greystar's Form Lease.

41.     Upon information and belief, Greystar enters into leasing agreements with tenants knowing that it will charge multiple Utility Admin Fees regardless of the terms of Greystar's Form Lease.

42.     Greystar fails to disclose the aforementioned policy because Greystar knows that, if prospective tenants were aware of said policy, they would not enter into a leasing agreement with Greystar.

### *Greystar Operates and Holds Itself Out as a Fully Integrated Business*

43.    While Greystar maintains a complicated web of corporate entities on paper, it operates and holds itself out to the world as one unified business. Greystar markets itself as a provider of "fully integrated real estate services"[5] with a "vertically-integrated business model."[6] In selling itself to clients, Greystar promotes its cohesive operations. On Greystar.com, the company touts the "Greystar Advantage," which includes "[s]ystems, technologies and toolkits to ensure consistency in how we operate our properties and serve our residents."[7]

44.    Many of Greystar's functions are standardized across its operations. For instance, Greystar relies on consolidated enterprise services to provide support across all of Greystar's lines of business in the United States, including for human resources, corporate technology services, risk management, and corporate accounting and tax. It also maintains a dedicated Support Services team to provide client services, marketing, finance, technology, and business systems for its property management functions. Greystar employs common internal operating policies and procedures for its property management functions, has executives who simultaneously serve in roles with GREP LLC, GREP General Partner, GS Management Services, and RS National, and shares common registered business addresses for each of the Defendants. Additionally, Greystar frequently enters into contracts that apply across the entire organization.

45.    Greystar's primary corporate website, Greystar.com, also presents the company as a single entity. For example, on the Greystar.com website, Greystar touts that it has a "presence in 161 markets in the US, supported by 49 offices" and highlights its "Regional Offices" throughout

---

[5] https://www.greystar.com/regions/north-america/united-states-business-services (last accessed Feb. 5, 2025).

[6] https://www.greystar.com/business-services/development-and-construction/how-we-work (last accessed Feb. 5, 2025).

[7] https://www.greystar.com/business-services/property-management/the-greystar-advantage (last accessed Feb. 5, 2025).

the country; advertises all the properties it manages; lists job postings for a wide range of positions across Greystar's corporate landscape; issues press releases boasting of Greystar's activities, generally without specifying the corporate entity directly responsible; defines Greystar Real Estate Partners, LLC as "Greystar" in the website "Terms of Use"; and advises that its privacy policy applies to information Greystar receives in a wide range of situations, including "[t]hrough the Greystar websites operated by Greystar and its affiliates."

46.    Greystar's website specifically identifies many of its regional subsidiaries, including Defendant GREP Texas, as doing business as "Greystar."[8]

47.    The property-specific online platforms that Greystar manages for each property, regardless of which specific subsidiary is contracted for property management, are branded with the "Greystar" logo. Clicking on the logo takes the user to Greystar.com.[9] Likewise, clicking on the "Privacy Policy" link at the bottom of the website also directs the user to Greystar's Global Privacy Policy webpage on Greystar.com.[10]

48.    Tenants and prospective tenants may also be unable to identify which Greystar entity they are dealing with. The email domain Greystar generally uses for contact emails for the properties it manages is "@greystar.com," regardless of the specific Greystar corporate entity contracted to manage the property. Finally, lease agreements at many of Greystar's managed properties refer the tenant to www.greystar.com/privacy for information about the applicable privacy policy.

---

[8] https://www.greystar.com/disclosures-and-licenses (last accessed Feb. 5, 2025).
[9] *See, e.g.*, https://www.therenaissanceatprestonhollow.com/ (last accessed Feb. 5, 2025).
[10] *Id.*

## PLAINTIFF'S EXPERIENCES

49.     Plaintiff Lopez has leased an apartment at a Greystar Managed Property from at least 2021 to the present.

50.     From at least 2021 to the present, Plaintiff Lopez has continuously entered into 12-month and short-term leases with Greystar.

51.     Over the course of his lease agreements with Defendants, Plaintiff Lopez has been illegally, unfairly, and deceptively charged by Defendants numerous hidden, junk, and Utility Admin Fees not provided for in his respective lease agreements with Greystar.

52.     In or around January of 2025, Plaintiff Lopez discovered that he had been charged Utility Admin Fees that his lease agreement with Greystar did not authorize. Subsequently, Plaintiff Lopez reached out to the leasing office at his Greystar Managed Property at renaissanceph@greystar.com to inform them of this issue.

Renaissance team,

Since renewing my lease in apartment 7406, effective November 5, 2024, I have been charged two monthly utility administrative fees totalling $8.00 -- both of which are not listed in the mutually-signed lease.

A screenshot of the latest balance is below.

2/5/25, 5:43 PM                                          Gmail - Erroneous billing within Resident Portal - 7406



| Balance Details | |
| --- | --- |
| Pest Control Rebill | $3.00 |
| Trash Rebill - Door to Door | $25.00 |
| Utility Admin Fee | $3.00 |
| Water Rebill - Expense | $26.03 |
| Trash Rebill - Expense | $16.77 |
| Sewer Rebill - Expense | $23.11 |
| Utility Admin Fee | $5.00 |
| Base Rent | $1,833.00 |
| Total | $1,934.91 |

**Close**

Under section L in my renewal lease, which took effect on November 5, 2024 and is currently active, the only additional charges listed are pest control and trash/recycling.

**L. Additional Rent - Monthly Recurring Fixed Charges.** You will pay separately for these items as outlined below and/or in separate addenda, Special Provisions or an amendment to this Lease.

| | | | |
| --- | --- | --- | --- |
| Animal rent   $ 0.00 | Cable/satellite   $ | Internet   $ |
| Package service  $ | Pest control   $ 3.00 | Stormwater/drainage  $ |
| Trash service   $ | Washer/Dryer   $ | |
| Other: Trash/Recycling Flat Fee | | $ 25.00 |
| Other: | | $ |
| Other: | | $ |
| Other: | | $ |

**M. Utilities and Other Variable Charges.** You will pay separately for gas, water, wastewater, electricity, trash/recycling, utility billing fees and other items as outlined in separate addenda, Special Provisions or an amendment to this Lease.

**Utility Connection Charge or Transfer Fee:** $ 50.00 _____ (not to exceed $50) to be paid within 5 days of written notice **(Par. 3.5)**

**N. Other Charges and Requirements.** You will pay separately for these items or comply with these requirements as outlined in a Master Lease Addendum, separate addenda or Special Provisions.          **Initial Access Device:** $ _____

**Additional or Replacement Access Devices:** $ 75.00          **Required Insurance Liability Limit (per occurrence):** $ 100000.00

**Special Provisions.** See Par. 32 or additional addenda attached. This Lease cannot be changed unless in writing and signed by you and us.

In my old lease, which ended on November 4, 2024, a Conservice Billing Fee was listed. But again, there is no additional fee listed in the current active lease agreement outside of trash/recycling and pest control.

**L. Additional Rent - Monthly Recurring Fixed Charges.** You will pay separately for these items as outlined below and/or in separate addenda, Special Provisions or an amendment to this Lease.

| | | | |
| --- | --- | --- | --- |
| Animal rent   $ | Cable/satellite   $ | Trash service   $ |
| Internet   $ | Package service  $ | Pest control   $ 3.00 |
| Storage   $ | Stormwater/drainage  $ | Washer/Dryer   $ |
| Other: Trash/Recycling Flat Fee | | $ 25.00 |
| Other: Conservice Billing Fee | | $ 5.00 |
| Other: | | $ |
| Other: | | $ |

**M. Utilities and Other Variable Charges.** You will pay separately for gas, water, wastewater, electricity, trash/recycling utility billing fees and other items as outlined in separate addenda, Special Provisions or an amendment to this Lease.

**Utility Connection Charge or Transfer Fee:** $ _____50.00_____ (not to exceed $50) to be paid within 5 days of written notice **(Par. 3.5)**

**Special Provisions.** See Par. 32 or additional addenda attached. The Lease cannot be changed unless in writing and signed by you and us.

Can you confirm that you will investigate my account history and appropriately credit my account for any erroneous billing charges?

53.    Without referring to the controlling lease agreement, Greystar justified these Utility Admin Fees by referring Plaintiff Lopez to a marketing "fee sheet" (completely separate from the controlling lease agreement), which lists various administrative fees.



54.    Greystar insisted to Plaintiff Lopez that, because these fees are detailed on a marketing "fee sheet" (completely separate from the controlling lease agreement), they are "correctly listed on your ledger."

55.    Upon information and belief, Greystar believes it is entitled to charge administrative fees as it sees fit regardless of what the controlling lease agreements provide.

56.     The phrase "Utility Admin Fee" appears nowhere in Plaintiff's current lease agreements with Greystar (the "2024-25 Lease Agreement", attached as **Exhibit A**), nor does a "$5.00" amount appear in his 2024-25 Lease Agreement.

57.     As Greystar pursues the Utility Admin Fees even through collections actions up to and including eviction, Plaintiff Lopez has paid these Utility Admin Fees under protest.



58.     Throughout the course of Plaintiff Lopez's 2023-2024 Lease Agreement (attached as **Exhibit B**) with Greystar, Plaintiff Lopez was charged Utility Admin Fees that his controlling lease agreement with Greystar did not authorize. Specifically, Plaintiff Lopez was charged a $2.90 Utility Admin Fee in October of 2023 that his controlling lease agreement with Greystar did not authorize.

| | |
|---|---|
| Date | Oct 01, 2023 |
| Description | Utility Admin Fee |
| Amount | $2.90 |
| Amount Paid | $2.90 |

59.     The phrase "Utility Admin Fee" appears nowhere in Plaintiff Lopez's 2023-2024 Lease Agreement, nor does a "$5.00" amount appear in his 2023-2024 Lease Agreement.

60.    Upon information and belief, Plaintiff Lopez was charged Utility Admin Fees that his controlling lease agreement with Greystar did not authorize numerous times from at least 2021 to the present.

61.    Had Plaintiff Lopez been aware of Greystar's illegal practices as to the illegal Utility Admin Fees, Plaintiff Lopez would have never entered into a lease agreement with Defendants.

## CLASS ACTION ALLEGATIONS

62.    Plaintiff brings this action individually and on behalf of all others similarly situated.

63.    Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> All persons residing in the United States who were charged a Utility Admin Fee by Defendants (the "Class").

> All persons residing in the Texas who were charged a Utility Admin Fee by Defendants (the "Texas Subclass", together with the "Class", the "Classes").

64.    Excluded from the Classes are Defendants' officers and directors, and any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Classes are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

65.    Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Classes meets the criteria for certification Fed. R. Civ. P. Rule 23.

66.    Numerosity, Fed. R. Civ. P. 23(a)(1): The Members of the Classes are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiff at this time, but the number class members are believed to be in the thousands.

67. <u>Commonality</u>. As required by Fed. R. Civ. P. 23(a)(2) and (b)(3), there are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.    Whether all or some of the Utility Admin Fees are provided for by Defendants' Form Lease;

    b.    Whether Defendants' assessment of Utility Admin Fees breached their contract with Plaintiff and Class Members;

    c.    Whether Defendants' assessment of Utility Admin Fees was unfair, deceptive, or misleading;

    d.    Whether Greystar's Form Lease identifies or describes the method by which Utility Admin Fees will be calculated or determined;

    e.    Whether it is Greystar's policy to charge as many Utility Admin Fees as possible regardless of the terms of Greystar's Form Lease; and

    f.    Whether Greystar enters into leasing agreements with tenants knowing that it will charge as many Utility Admin Fees as possible regardless of the terms of the lease agreement.

68. <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because Plaintiff was charged Utility Admin Fees and Plaintiff's lease agreement is substantively identical to that of other Class Members.

69. <u>Adequacy of Representation</u>, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Members of the Classes. Plaintiff's Counsel

18

is competent and experienced in litigating class actions, including consumer protection litigation of this kind.

70.    <u>Predominance</u>. Greystar has engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff and Class Members all had substantively identical lease agreements and were charged illegal Utility Admin Fees. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

71.    <u>Superiority</u>, Fed. R. Civ. P. 23(b)(3): A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Greystar. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

72.    Greystar has acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis. Plaintiff seeks not only recompense for the damages sustained by himself and the Classes, but also that Defendants be enjoined from further charging and collecting illegal Utility Admin Fees.

73.     Likewise, particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    Whether all or some of the Utility Admin Fees are provided for by Defendants' Form Lease;

    b.    Whether Defendants' assessment of Utility Admin Fees breached their contract with Plaintiff and Class Members;

    c.    Whether Defendants' assessment of Utility Admin Fees was unfair, deceptive, or misleading;

    d.    Whether Greystar's Form Lease identifies or describes the method by which Utility Admin Fees will be calculated or determined;

    e.    Whether it is Greystar's policy to charge as many Utility Admin Fees as possible regardless of the terms of Greystar's Form Lease; and

    f.    Whether Greystar enters into leasing agreements with tenants knowing that it will charge as many Utility Admin Fees as possible regardless of the terms of the lease agreement.

74.     Finally, all members of the proposed Classes are readily ascertainable. Greystar has access to Class Members' names and addresses through Defendants' lease agreements with Class Members.

## CAUSES OF ACTION

### First Count
### Breach of Contract
### (On Behalf of Plaintiff and the Class)

75.     Plaintiff realleges and incorporates the above allegations as if fully set forth herein.

76.     Plaintiff and Class Members entered into contracts with Greystar for the lease of rental apartments (the "Form Lease").

77.     Plaintiff's and Class Members' Form Lease agreement with Greystar lists all the charges that Greystar can assess against Plaintiff and Class Members.

78.     Plaintiff's and Class Members' Form Lease agreement with Greystar provides that the Form Lease "is the entire agreement" between the parties.

79.     In violation of Plaintiff's and Class Members' Form Lease agreement with Greystar, Greystar charged Plaintiff and Class Members Utility Admin Fees not provided by the Form Lease agreement.

80.     As a result of these extracontractual Utility Admin Fees, Plaintiff and Class Members and have suffered damaged.

### Second Count
### Violations of the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41, *et seq.*
### (On Behalf of Plaintiff and the Texas Subclass)

81.     Plaintiff realleges the above allegations as if fully set forth herein.

82.     Greystar has, in the course and scope of trade and commerce, engaged in false, misleading, and deceptive acts and practices declared unlawful in section 17.46(a) of the DTPA.

83.     Greystar has engaged in false, misleading, and deceptive acts and practices declared unlawful in section 17.46(b) of the DTPA, including but not limited to:

a.  representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law (17.46(b)(9)); and

b.  failing to disclose information concerning goods or services which was known at the time of the transaction where such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed (17.46(b)(24)).

84.  Greystar has engaged in false, misleading, and deceptive acts and practices by charging Plaintiff and the Texas Subclass Utility Admin Fees not provided for by their respective lease agreements with Greystar.

85.  Greystar has engaged in false, misleading, and deceptive acts and practices by representing in its bills that many (if not all) of the Utility Admin Fees that it billed to Plaintiff and the Texas Subclass were provided for or authorized by Plaintiff's and the Texas Subclass Members' respective lease agreements with Greystar.

86.  Greystar has engaged in false, misleading, and deceptive acts and practices by entering into lease agreements with Plaintiff and the Texas Subclass that Greystar, at the time of their consummation, intended to breach by later charging Utility Admin Fees not provided for by Greystar's respective lease agreements with consumers.

87.  Greystar has taken advantage of consumers' lack of knowledge, ability, experience, and capacity to a grossly unfair degree and to the consumers' detriment and, thus, engaged in an unconscionable course of action by:

a.  offering lease agreements which are contracts of adhesion;

     b.       charging Plaintiff and the Texas Subclass Utility Admin Fees not provided for by their respective lease agreements with Greystar;

     c.       representing in its lease bills that many (if not all) of the Utility Admin Fees that it billed to Plaintiff and the Texas Subclass were provided for or authorized by Plaintiff's and Texas Subclass Members' respective lease agreements with Greystar;

     d.       taking advantage in the disparity of knowledge, ability, experience, and capacity between Greystar (a sophisticated property management company managing over a billion dollars in assets) and consumers who lack the knowledge, ability, experience, and capacity to understand complex and lengthy leasing agreements;[11] and

     e.       taking advantage in the disparity of knowledge, ability, experience, and capacity between Greystar (a sophisticated property management company managing over a billion dollars in assets) and consumers who lack the knowledge, ability, experience, and capacity to cross reference their lease bills with their lease agreements to ensure that every line item of their lease bill is authorized by their lease agreement.[12]

---

[11] https://blog.adobe.com/en/publish/2025/02/04/top-5-takeaways-from-new-contracts-survey-most-people-sign-before-they-read (Adobe study reveals "70% of consumers admit to signing contracts without knowing what's in the." "63 percent of technology leaders [report] difficulty interpreting contracts….") (last accessed Feb. 6, 2025); https://contracts.jotwell.com/reading-fine-print-actually-worse-consumers-case-unenforceable-terms/ ("Formal research confirms that few consumers pay attention to fine print and that disclosures are poorly designed and too abundant to be effective.") (last accessed Feb. 6, 2025).

[12] *Id.*; https://www.esource.com/email/ENEWS/2016/Billing ("research found that only 17 percent of customers feel that they have a very good understanding of their [utility] bill") (last accessed Feb. 6, 2025).

88.     Greystar's false, misleading, and deceptive acts and practices have caused Plaintiff and the Texas Subclass economic damages and mental anguish.

89.     As a result of Defendants' false, misleading, and deceptive acts and practices, Plaintiff seeks treble damages, equitable relief, prejudgment interests, and costs and reasonable and necessary attorneys' fees.

### Third Count
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

90.     Plaintiff realleges the above allegations as if fully set forth herein. Plaintiff brings this claim individually and on behalf of all Class Members. This count is plead in the alternative to the breach of contract count above.

91.     Plaintiff and Class Members conferred a monetary benefit on Greystar by remitting monies for Utility Admin Fees not provided for by the parties Form Lease and never disclosed to Plaintiff and Class Members prior to their entering into a lease agreement with Defendants. In exchange for this monetary benefit, Defendants conferred no benefit upon Plaintiff and Class Members above what Plaintiff and Class Members were already entitled to under their lease agreements with Greystar.

92.     Defendants knew that Plaintiff and Class Members conferred a benefit upon Defendants and which Defendants accepted.

93.     Under the principles of equity and good conscience, Defendants should not be permitted to retain monies belonging to Plaintiff and Class Members.

94.     Plaintiff and Class Members have no adequate remedy at law.

95.     As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer damages.

96.     Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid to Defendants.

**Fourth Count**
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

97.     Plaintiff realleges and incorporate by reference the paragraphs above as if fully set forth herein.

98.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

99.     An actual controversy has arisen in that Plaintiff alleges that Greystar charges Plaintiff and the Class Utility Admin Fees not provided for by their respective lease agreements with Greystar.

100.    Plaintiff and the Class will continue to suffer injury because Greystar will continue to charge Plaintiff and the Class Utility Admin Fees not provided for by their respective lease agreements with Greystar.

101.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, that many (if not all) of the Utility Admin Fees charged by Greystar to Plaintiff and the Class are not provided for by their respective lease agreements with Greystar.

102.    The Court also should issue corresponding prospective injunctive relief enjoining Greystar from charging Plaintiff and the Class for Utility Admin Fees not provided for by their respective lease agreements with Greystar.

103.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and lack an adequate legal remedy.

104.    The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Greystar if an injunction is issued as Greystar has pre-existing legal obligations to not charge for Utility Admin Fees not provided for by the respective lease agreements.

105.    Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by preventing the unjust enrichment of Greystar at consumers' expense.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a)  For an Order certifying this action as a class action and appointing Plaintiff and their counsel to represent the Class;

b)  For equitable relief enjoining Greystar from engaging in the wrongful conduct complained of herein;

c)  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

d)  For an award of actual damages, compensatory damages, nominal damages, and treble damages, in an amount to be determined, as allowable by law;

e)  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

26

f) Pre- and post-judgment interest on any amounts awarded; and

g) Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: February 14, 2025                          Respectfully submitted,

                                                  */s/Jarrett L. Ellzey*
                                                  Jarrett L. Ellzey
                                                  (Tex. Bar No. 24040864)
                                                  Leigh Montgomery
                                                   (Tex. Bar No. 24052214)
                                                  **EKSM, LLP**
                                                  4200 Montrose Blvd., Suite 200
                                                  Houston, TX 77066
                                                  Tel.: (888) 350-3931
                                                  Fax: (888) 995-3335
                                                  jellzey@eksm.com
                                                  lmontgomery@eksm.com

                                                  Gary E. Mason*
                                                  Danielle L. Perry*
                                                  Lisa A. White*
                                                  Ra O. Amen*
                                                  **MASON LLP**
                                                  5335 Wisconsin Avenue, NW, Suite 640
                                                  Washington, DC 20015
                                                  Tel: (202) 429-2290
                                                  gmason@masonllp.com
                                                  dperry@masonllp.com
                                                  lwhite@masonllp.com
                                                  ramen@masonllp.com

                                                  and

27

Gary M. Klinger*
Alexander E. Wolf (Texas Bar No.
24134558)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com
awolf@milberg.com


*Counsel for Plaintiff and the putative class*

*\*pro hac vice applications for admission to
be filed*