**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| JOSEPH LOPEZ, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>GREYSTAR REAL ESTATE PARTNERS, LLC, d/b/a "Greystar," a limited liability company;<br><br>GREP GENERAL PARTNER, LLC, d/b/a "Greystar," a limited liability company;<br><br>GREYSTAR RS NATIONAL, LLC, d/b/a "Greystar," a limited liability company;<br><br>GREYSTAR MANAGEMENT SERVICES, LLC, d/b/a "Greystar," a limited liability company; and<br><br>GREP TEXAS, LLC, d/b/a "Greystar," a limited liability company,<br><br>        Defendants. | CASE NO.: 3:25-cv-00378-B<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## <u>CLASS ACTION COMPLAINT</u>

1.      Plaintiff Joseph Lopez ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendants Greystar Real Estate Partners, LLC, GREP General Partner, LLC, Greystar RS National, LLC, Greystar Management Services, LLC, and GREP Texas, LLC (collectively referred to as "Greystar") to obtain damages, restitution, and equitable relief from Defendants. Plaintiff makes the following allegations upon personal knowledge, the investigation of counsel, facts that are a matter of public record, and upon information and belief as to all other matters.

## **NATURE OF THE ACTION**

2.     This class action arises out of Greystar's deceptive, unfair, and illegal "Utility Admin Fees" assessed against tenants since at least 2019 to the present.

3.     In January 2025, the Federal Trade Commission (the "FTC") and the State of Colorado filed a complaint against Greystar alleging that, since at least 2019, Greystar has "used deceptive advertising to entice consumers into applying for rental housing, and then bilked those consumers out of hundreds of millions of dollars by charging 'Hidden Fees' (mandatory, fixed fees that are not included in the advertised price) for itself and its landlord clients."[1] In other words, Greystar conceals the real price of leasing its units from price sensitive consumers and only reveals those Hidden Fees to consumers in lengthy lease agreements after consumers have dedicated significant time to the application process, paid expensive application fees, and sometimes given up prior living arrangements. (The "FTC Allegations".)

4.     In addition to the FTC Allegations, Plaintiff has also found that many Hidden Fees (labelled as Utility Admin Fees) are never disclosed to consumers (until consumers are billed for them) or even provided for in Greystar's lease agreements. In other words, many of the Hidden and Utility Admin Fees that Greystar charges its tenants on a monthly basis are not authorized by or even mentioned in Greystar's lease agreements with its tenants.

5.     Each month, Greystar assesses small "Utility Admin Fees" of approximately $1.00-$5.00 (many of which are not provided for in Greystar's lease agreements) in hopes that these charges will go unnoticed and uncontested by tenants who have limited time and knowledge of their lengthy and complicated lease agreements.

---

[1] *FTC, et al. v Greystar, et al.*, Case No. 1:25-cv-00165, ECF No. 1.

6.      Many, if not all, of these Utility Admin Fees serve no legitimate purpose but to increase Greystar's profits and inflate its bottom line at tenants' expense.

7.      Plaintiff brings this action against Greystar seeking redress for its unlawful conduct and asserts claims for (i) money had and received and (ii) violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA").

8.      Plaintiff seeks remedies including, but not limited to, compensatory damages, nominal damages, and equitable relief.

## PARTIES

9.      Plaintiff Joseph Lopez is an individual and citizen of the State of Texas residing in the city of Dallas, Texas.

10.      Defendant Greystar Real Estate Partners, LLC ("GREP LLC"), also doing business as "Greystar," is a Delaware corporation with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403. GREP LLC is a multi-family rental property owner, developer, and manager, with offices located across the United States. Alongside Defendant GREP General Partner, LLC, and through its subsidiaries, GREP LLC directly or indirectly manages rental properties across the United States. It conducts its property management business through a web of subsidiaries, including Defendants Greystar Management Services, LLC, and Greystar RS National, LLC. At times material to this Complaint, GREP LLC has directly or indirectly advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States. At all times material to this Complaint, GREP LLC has controlled the acts and practices of its subsidiaries described below and approved of or benefited from such subsidiaries' acts and practices at issue in this Complaint.

3

11.    Defendant GREP General Partner, LLC ("GREP General Partner"), also doing business as "Greystar," is a Delaware limited liability company with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403. At times material to this Complaint, through its role as general partner in Greystar Management Services, LP (predecessor to Greystar Management Services, LLC) and other Greystar-related limited partnerships, GREP General Partner has directly or indirectly advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States. At all times material to this Complaint, GREP General Partner has controlled the acts and practices of its subsidiaries described below and approved of or benefited from such subsidiaries' acts and practices at issue in this Complaint.

12.    Defendant Greystar RS National, LLC ("RS National"), also doing business as "Greystar," is a Delaware limited liability company with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403. RS National is a wholly owned subsidiary of GREP LLC. At times material to this Complaint, RS National has directly or indirectly advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States. Together with Defendant GS Management Services, and through its subsidiaries, RS National acts directly or indirectly as property manager for over 800,000 rental units nationwide (including apartments and beds in student housing properties). At all times material to this Complaint, RS National has controlled the acts and practices of its subsidiaries described below and approved of or benefited from such subsidiaries' acts and practices at issue in this Complaint.

13.    Defendant Greystar Management Services, LLC ("GS Management Services"), also doing business as "Greystar," is a Delaware limited liability company with its principal place

of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403. GS Management Services is a subsidiary of GREP LLC. At times material to this Complaint, GS Management Services has operated as Greystar Management Services, LP, a limited partnership, in which GREP LLC held a 99 percent interest and GREP General Partner owned a 1 percent interest as general partner. Upon information and belief, GS Management Services wholly owns Defendant GREP Texas. Upon information and belief, GS Management Services is primarily responsible for developing Greystar's property management products, tools, and services (consulting, management, and otherwise). At times material to this Complaint, GS Management Services has directly or indirectly advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States. Together with Defendant Greystar RS National, LLC, and through its subsidiaries, GS Management Services acts directly or indirectly as property manager for over 800,000 rental units nationwide (including apartments and beds in student housing properties). At all times material to this Complaint, GS Management Services has controlled the acts and practices of its subsidiaries described below and approved of or benefited from such subsidiaries' acts and practices at issue in this Complaint.

14.    Defendant GREP Texas, LLC ("GREP Texas"), also doing business as "Greystar," is a limited liability company with its principal place of business at 600 E. Las Colinas Boulevard, Suite 2100, Irving, Texas 75039. Upon information and belief, GREP Texas is a wholly owned subsidiary of Defendant GS Management Services. Upon information and belief, GREP Texas contracts directly with property owners to manage rental properties located in the State of Texas. Upon information and belief, the employees of GREP Texas conduct the day-to-day management duties (*e.g.*, managing accounts receivable and payable including billing, property maintenance,

and tenant communications) for property owners that contract with GREP Texas for property management services. As part of its management responsibilities, and at times material to this Complaint, GREP Texas has directly or indirectly advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States.

## COMMON ENTERPRISE

15.    Defendants have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged herein. Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, and office locations, and unified advertising and internal operating policies and procedures. Defendants share revenues generated from the deceptive acts and practices and other violations of law alleged herein. Because these Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

16.    The properties from which Plaintiff Lopez leased his apartments at issue in this action (Renaissance at Preston Hollow and Village on the Lake) are owned by GSMV Renaissance at Preston Hollow, LLC and GSMV Village on the Lake Owner, LLC, respectively. Upon information and belief, both GSMV Renaissance at Preston Hollow, LLC and GSMV Village on the Lake Owner, LLC have common ownership, officers, managers, business functions, and office locations, and unified advertising and internal operating policies and procedures with Greystar.[2] GSMV Renaissance at Preston Hollow, LLC, GSMV Village on the Lake Owner, LLC, and

---

[2] https://comptroller.texas.gov/taxes/franchise/account-status/search/32082264105# (last accessed May 2, 2025); https://comptroller.texas.gov/taxes/franchise/account-status/search/32082223770 (last accessed May 2, 2025).

Defendants have acted as a common enterprise in conducting the deceptive acts and practices and other violations of law alleged herein.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from that of Defendants.

18.    The Court has general personal jurisdiction over Defendants because, personally or through their agents, Defendants operate, conduct, engage in, or carry on businesses or business ventures in this State; Defendants have continuous and systematic contacts with this State; Defendants (directly or indirectly) own and manage "400+ properties" in this State[3]; GREP Texas maintain their headquarters in this State; and Defendants committed tortious acts in this State.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the District in which a substantial part of the events and omissions giving rise to the claim occurred and the District in which a substantial part of property that is the subject of the action is situated.

## FACTUAL ALLEGATIONS

### *Defendants' Business*

20.    Founded in 1993, Greystar brands itself as "The Global Leader in Rental Housing" providing "end-to-end property management services for residential housing, apartment homes, furnished corporate housing, and mixed-use properties incorporating retail space." As of January 1, 2025, Greystar manages more than "1 million multifamily units and student beds" globally.[4]

---

[3] https://livegreystartexas.com/ (last accessed May 2, 2025).
[4] https://www.greystar.com/business-services/property-management (last accessed Feb. 5, 2025).

21.     Greystar asserts that it "ranks first among the Top 50 US Apartment Managers according to the 2021 National Multifamily Housing Council."[5]

22.     Greystar also promotes itself as the "#1 owner" of rental apartments in the United States. According to NMHC's 2024 rankings, which are based on data submitted by property owners and define ownership as "exercis[ing] effective control over the asset," Greystar owns over 100,000 residential rental units nationwide. Greystar is also actively involved in the construction and development of apartment complexes both in the United States and globally.

23.     On its website, Greystar boasts that it has over $78 billion in assets under its management.[6]

24.     Greystar promotes its analytics and operational consistency, including standardized operating procedures and economies of scale, as a unique benefit of hiring Greystar as a property manager.

25.     Greystar provides property management services for rental properties it owns through its subsidiaries and joint ventures, as well as for properties owned by other individual and corporate landlords (rental properties managed by Defendants, whether or not owned by Greystar, are collectively referred to as "Greystar Managed Properties").

26.     When a property owned by Greystar is involved, one of Greystar's regional property management subsidiaries will typically enter into an agreement to provide services to the Greystar subsidiary holding the property title.

27.     Defendants enter into property management agreements ("PMAs") with the owners of all Greystar Managed Properties. Where properties are owned by Greystar, Defendants execute PMAs with the relevant Greystar subsidiary or holding company holding the property title. The

---

[5] *Id.*
[6] https://www.greystar.com/ (last accessed Feb. 5, 2025).

PMAs outline Greystar's duties to the property owners, including Greystar's responsibility for leasing, marketing, tenant relations, and day-to-day operations at the subject property. Greystar's PMAs with Greystar-owned properties do not vary significantly from its PMAs with properties owned by third parties.

28.     Greystar offers a wide range of property management services to its clients. Pursuant to the PMAs, Greystar is generally responsible for:

    a.    advertising available rental units;

    b.    ensuring the information displayed on property websites is accurate;

    c.    communicating with current and prospective tenants;

    d.    leasing rental units to qualified tenants;

    e.    billing tenants and collecting payments;

    f.    marketing properties and maintaining property websites;

    g.    hiring and training all on-site personnel at the property;

    h.    entering into contracts with third-party service providers as the property owner's agent;

    i.    maintaining apartment units and property premises in a habitable condition;

    j.    developing an annual budget for each property and submitting quarterly or annual reports to property owners; and

    k.    ensuring the collection of tenants' monthly payments.

29.     As property manager, Greystar is responsible for all tenant relations on behalf of the property owner. In most circumstances, Greystar serves as the primary point of contact for consumers interested in renting a unit at Greystar Managed Properties and for tenants residing in those properties.

30.     In exchange for these services, property owners generally pay Greystar the greater of a flat fee or a percentage of the Greystar Managed Property's gross rental revenue. (Upon information and belief, these funds are paid directly to Defendant GREP Texas, LLC and distributed to the other Greystar Defendants.) Upon information and belief, gross rental revenue includes all nonrefundable amounts collected from tenants, including any Hidden Fees charged to tenants.

31.     Greystar offers consulting services and property management tools which it brands as the Greystar Advantage, "a holistic business model proven to achieve operational and performance excellence… to create unparalleled competitive advantages for our properties and meet the rental housing investment objectives of our clients."[7] The Greystar Advantage business model includes "standard best practices, processes, toolkits," systems, and technologies for driving profit and handling reputation management and legal compliance.[8]

32.     Upon information and belief, the Greystar Advantage business model encompasses Defendants' scheme to charge Hidden and unauthorized Utility Admin Fees.

33.     Upon information and belief, the Greystar Advantage business model is developed by GS Management Services, implemented by GREP Texas and other regional Greystar property management companies, and approved and managed by GREP LLC, GREP General Partner, and RS National.

### *Greystar's Illegal Utility Admin Fees*

34.     Upon information and belief, all Greystar Managed Properties utilize the same or substantially similar form lease terms and policies, with only minor variations ("Form Lease").

---

[7] https://www.greystar.com/business-services/property-management/the-greystar-advantage (last visited May 2, 2025).
[8] *Id.*

35.     The Form Lease is a contract of adhesion consisting of boilerplate terms and provided to tenants on a take-it-or-leave-it basis.

36.     As a result of the standardized language of the Form Lease, all Greystar tenants are subject to essentially identical lease terms regardless of where they reside.

37.     Upon information and belief, Greystar's billing practices are substantially similar across Greystar Managed Properties.

38.     Upon information and belief, Greystar attempts to collect Utility Admin Fees and other junk and hidden fees not authorized by the Form Lease from tenants across all Greystar Managed Properties.

39.     Each month, Greystar assesses tenant with small Utility Admin Fees of approximately $1.00-$5.00. Greystar keeps the Utility Admin Fees relatively small with the intent that they will go unnoticed and uncontested by tenants. Greystar capitalizes on the likelihood, that tenants, who often have limited time and understanding of the detailed terms of their lease agreements, will be less inclined to question or dispute these charges.

40.     At the beginning of each month, Greystar sends and publishes bills and "balance" notices to tenants (via mail, email, and Greystar managed websites) representing that Utility Admin Fees are due to be paid by tenants pursuant to the terms of the tenants' lease agreements with Greystar.



41.    Greystar's Form Lease does not provide for many, if not all, of these Utility Admin Fees.

42.    Upon information and belief, Greystar refuses to remove Utility Admin Fee charges, even upon the protest of tenants, and pursues the Utility Admin Fees even through collections actions up to and including eviction causing tenants not only economic damages but mental anguish.

43.    Upon information and belief, it is Greystar's policy to charge multiple Utility Admin Fees regardless of the terms of Greystar's Form Lease.

44.    Upon information and belief, Greystar enters into leasing agreements with tenants knowing that it will charge multiple Utility Admin Fees regardless of the terms of Greystar's Form Lease.

45.    Greystar fails to disclose the aforementioned policy because Greystar knows that, if prospective tenants were aware of said policy, they would not enter into a leasing agreements with Greystar.

### *Greystar Operates and Holds Itself Out as a Fully Integrated Business*

46.    While Greystar maintains a complicated web of corporate entities on paper, it operates and holds itself out to the world as one unified business. Greystar markets itself as a provider of "fully integrated real estate services"[9] with a "vertically-integrated business model."[10] In selling itself to clients, Greystar promotes its cohesive operations. On Greystar.com, the Greystar touts the "Greystar Advantage," which includes "[s]ystems, technologies and toolkits to ensure consistency in how we operate our properties and serve our residents."[11]

47.    Many of Greystar's functions are standardized across its operations. For instance, Greystar relies on consolidated enterprise services to provide support across all of Greystar's lines of business in the United States, including for human resources, corporate technology services, risk management, and corporate accounting and tax. It also maintains a dedicated Support Services team to provide client services, marketing, finance, technology, and business systems for its property management functions. Greystar employs common internal operating policies and procedures for its property management functions; has executives who simultaneously serve in roles with GREP LLC, GREP General Partner, RS National, GS Management Services, and GREP Texas; and shares common registered business addresses for many of the Defendants. Additionally, Greystar frequently enters into contracts with terms that apply across the entire Greystar family of companies.

48.    Greystar's primary corporate website, Greystar.com, also presents the Greystar family of companies as a single entity. For example, on the Greystar.com website, Greystar touts

---

[9] https://www.greystar.com/regions/north-america/united-states-business-services (last accessed Feb. 5, 2025).
[10] https://www.greystar.com/business-services/development-and-construction/how-we-work (last accessed Feb. 5, 2025).
[11] https://www.greystar.com/business-services/property-management/the-greystar-advantage (last accessed Feb. 5, 2025).

that it has a "presence in 161 markets in the US, supported by 49 offices" and highlights its "Regional Offices" throughout the country; advertises all the properties it manages; lists job postings for a wide range of positions across Greystar's corporate landscape; issues press releases boasting of Greystar's activities, generally without specifying the corporate entity directly responsible; defines Greystar Real Estate Partners, LLC as "Greystar" in the website "Terms of Use"; and advises that its privacy policy applies to information Greystar receives in a wide range of situations, including "[t]hrough the Greystar websites operated by Greystar and its affiliates."

49.    Greystar's website specifically identifies many of its regional subsidiaries, including Defendant GREP Texas, as doing business as "Greystar."[12]

50.    The property-specific online platforms that Greystar manages for each property, regardless of which specific subsidiary is contracted for property management, are branded with the "Greystar" logo. Clicking on the logo takes the user to Greystar.com.[13] Likewise, clicking on the "Privacy Policy" link at the bottom of the website also directs the user to Greystar's Global Privacy Policy webpage on Greystar.com.[14]

51.    Tenants and prospective tenants may also be unable to identify which Greystar entity they are dealing with. The email domain Greystar generally uses for contact emails for the properties it manages is "@greystar.com," regardless of the specific Greystar corporate entity contracted to manage the property. Finally, lease agreements at many of Greystar's managed properties refer the tenant to www.greystar.com/privacy for information about the applicable privacy policy.

---

[12] https://www.greystar.com/disclosures-and-licenses (last accessed Feb. 5, 2025).
[13] *See, e.g.*, https://www.therenaissanceatprestonhollow.com/ (last accessed Feb. 5, 2025).
[14] *Id.*

## PLAINTIFF LOPEZ'S EXPERIENCE

52.     Plaintiff Lopez has leased an apartment at a Greystar Managed Property from at least 2021 to the present.

53.     From at least 2021 to the present, Plaintiff Lopez has continuously entered into 12-month and short-term leases with Greystar.

54.     Upon entering into his lease agreements with Defendants and to the present, Plaintiff Lopez has been illegally, unfairly, and deceptively billed and charged by Defendants' numerous hidden, junk, and Utility Admin Fees not provided for in his respective lease agreements with Greystar.

55.     Upon information and belief, the balances noting the illegal Utility Admin Fees were published and sent to him by GREP Texas with the approval and under the direction of the other Defendants.

56.     In or around January of 2025, Plaintiff Lopez discovered that he had been charged Utility Admin Fees that his lease agreement with Greystar did not authorize. Subsequently, Plaintiff Lopez reached out to the leasing office at his Greystar Managed Property at renaissanceph@greystar.com to inform them of this issue.

Renaissance team,

Since renewing my lease in apartment 7406, effective November 5, 2024, I have been charged two monthly utility administrative fees totalling $8.00 -- both of which are not listed in the mutually-signed lease.

A screenshot of the latest balance is below.

2/5/25, 5:43 PM                              Gmail - Erroneous billing within Resident Portal - 7406



Under section L in my renewal lease, which took effect on November 5, 2024 and is currently active, the only additional charges listed are pest control and trash/recycling.

**L. Additional Rent - Monthly Recurring Fixed Charges.** You will pay separately for these items as outlined below and/or in separate addenda. Special Provisions or an amendment to this Lease.

| | | | |
|---|---|---|---|
| Animal rent | $ 0.00 | Cable/satellite $ | Internet $ |
| Package service $ | | Pest control $ 3.00 | Stormwater/drainage $ |
| Trash service $ | | Washer/Dryer $ | |
| Other: Trash/Recycling Flat Fee | | | $ 25.00 |
| Other: | | | $ |
| Other: | | | $ |
| Other: | | | $ |

**M. Utilities and Other Variable Charges.** You will pay separately for gas, water, wastewater, electricity, trash/recycling, utility billing fees and other items as outlined in separate addenda, Special Provisions or an amendment to this Lease.
Utility Connection Charge or Transfer Fee: $ 50.00 (not to exceed $50) to be paid within 5 days of written notice **(Par. 3.5)**

**N. Other Charges and Requirements.** You will pay separately for these items or comply with these requirements as outlined in a Master Lease Addendum, separate addenda or Special Provisions.    **Initial Access Device:** $
**Additional or Replacement Access Devices:** $ 75.00    **Required Insurance Liability Limit (per occurrence):** $ 100000.00

**Special Provisions.** See Par. 32 or additional addenda attached. This Lease cannot be changed unless in writing and signed by you and us.

In my old lease, which ended on November 4, 2024, a Conserve Billing Fee was listed. But again, there is no additional fee listed in the current active lease agreement outside of trash/recycling and pest control.

**L. Additional Rent - Monthly Recurring Fixed Charges.** You will pay separately for these items as outlined below and/or in separate addenda. Special Provisions or an amendment to this Lease.

| | | | |
|---|---|---|---|
| Animal rent | $ | Cable/satellite $ | Trash service $ |
| Internet | $ | Package service $ | Pest control $ 3.00 |
| Storage | $ | Stormwater/drainage $ | Washer/Dryer $ |
| Other: Trash/Recycling Flat Fee | | | $ 25.00 |
| Other: Conserve Billing Fee | | | $ 5.00 |
| Other: | | | $ |
| Other: | | | $ |

**M. Utilities and Other Variable Charges.** You will pay separately for gas, water, wastewater, electricity, trash/recycling, utility billing fees and other items as outlined in separate addenda, Special Provisions or an amendment to this Lease.
Utility Connection Charge or Transfer Fee: $ 50.00 (not to exceed $50) to be paid within 5 days of written notice **(Par. 3.5)**

**Special Provisions.** See Par. 32 or additional addenda attached. The Lease cannot be changed unless in writing and signed by you and us.

Can you confirm that you will investigate my account history and appropriately credit my account for any erroneous billing charges?

16

57.    Without referring to the controlling lease agreement, Greystar justified these Utility Admin Fees by referring Plaintiff Lopez to a marketing "fee sheet" (completely separate from the controlling lease agreement), which lists various administrative fees.



58.    Greystar insisted to Plaintiff Lopez that, because these fees are detailed on a marketing "fee sheet" (completely separate from the controlling lease agreement), they are "correctly listed on your ledger."

59.    Upon information and belief, Greystar believes it is entitled to charge administrative fees as it sees fit regardless of what the controlling lease agreements provide.

60.    The $5.00 Utility Admin Fee amount is unauthorized by and appears nowhere in Plaintiff's current lease agreement with Greystar (the "2024-25 Lease Agreement", attached as

**Exhibit A**). (Upon information and belief, the $3.00 Utility Admin Fee noted by Plaintiff in his email to Greystar refers to a "nominal administrative" trash removal fee which is detailed in the 2024-25 Lease Agreement. *See* 2024-25 Lease Agreement at 17(¶5). That "nominal administrative" trash removal fee is not one of the fees that, in this Complaint, Plaintiff asserts to be illegal or unauthorized by a lease agreement.)

61.    As Greystar pursues the Utility Admin Fees in collections actions up to and including eviction, Plaintiff Lopez has paid these Utility Admin Fees under protest. Upon information and belief, Greystar also does not allow for tenants to make partial payments of the amounts billed by Greystar.



62.    Throughout the course of Plaintiff Lopez's 2023-2024 Lease Agreement (attached as **Exhibit B**) with Greystar, Plaintiff Lopez was charged Utility Admin Fees that his controlling lease agreement with Greystar did not authorize. Specifically, Plaintiff Lopez was charged a $2.90 Utility Admin Fee in October of 2023 that his controlling lease agreement with Greystar did not authorize.

**CHARGES PAID**

| | |
|---|---|
| Date | Oct 01, 2023 |
| Description | Package Valet |
| Amount | $14.52 |
| Amount Paid | $14.52 |

| | |
|---|---|
| Date | Oct 01, 2023 |

le.com/mail/u/0/?ik=eb49f25d12&view=pt&search=all&permthid=thread-f:1778740348118159146&simpl=msg-f:1778740348

Gmail - Payment Confirmation for Joseph Lopez for Village on the Lake

| | |
|---|---|
| Description | Sewer Rebill - Expense |
| Amount | $15.18 |
| Amount Paid | $15.18 |

| | |
|---|---|
| Date | Oct 01, 2023 |
| Description | Water Rebill - Expense |
| Amount | $10.19 |
| Amount Paid | $10.19 |

| | |
|---|---|
| Date | Oct 01, 2023 |
| Description | Pest Control Rebill |
| Amount | $3.87 |
| Amount Paid | $3.87 |

| | |
|---|---|
| Date | Oct 01, 2023 |
| Description | Utility Admin Fee |
| Amount | $2.00 |
| Amount Paid | $2.00 |

| | |
|---|---|
| Date | Oct 01, 2023 |
| Description | Trash Rebill - Expense |
| Amount | $6.00 |
| Amount Paid | $6.00 |

| | |
|---|---|
| Date | Oct 01, 2023 |
| Description | Gas Rebill |
| Amount | $0.07 |
| Amount Paid | $0.07 |

| | |
|---|---|
| Date | Oct 01, 2023 |
| Description | Transfer Fees |
| Amount | $500.00 |
| Amount Paid | $500.00 |

| | |
|---|---|
| Date | Oct 01, 2023 |
| Description | Rent |
| Amount | $1,447.74 |
| Amount Paid | $1,447.74 |

| | |
|---|---|
| Date | Oct 01, 2023 |
| Description | Utility Admin Fee |
| Amount | $3.00 |
| Amount Paid | $3.00 |

| | |
|---|---|
| Date | Oct 01, 2023 |
| Description | Utility Admin Fee |
| Amount | $2.90 |
| Amount Paid | $2.90 |

| | |
|---|---|
| Date | Oct 01, 2023 |
| Description | Trash Rebill - Expense |

n/mail/u/0/?ik=eb49f25d12&view=pt&search=all&permthid=thread-f:1778740348118159146&simpl=msg-f:177874034

**Gmail - Payment Confirmation for Joseph Lopez for Village on the Lake**

| | |
|---|---|
| Amount | $5.81 |
| Amount Paid | $5.81 |
| **Total** | **$2,011.28** |

63.    This "$2.90" amount is unauthorized and appears nowhere in Plaintiff Lopez's 2023-2024 Lease Agreement.

64.    Upon information and belief, Plaintiff Lopez was charged Utility Admin Fees that his controlling lease agreement with Greystar did not authorize numerous times from at least 2021 to the present.

65.     Had Plaintiff Lopez been aware of Greystar's illegal practices as to the illegal Utility Admin Fees, Plaintiff Lopez would have never entered into a lease agreement with Defendants.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action individually and on behalf of all others similarly situated.

67.     Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> All persons residing in the United States who were charged an unauthorized Utility Admin Fee by Defendants (the "Class").

> All persons residing in the Texas who were charged an unauthorized Utility Admin Fee by Defendants (the "Texas Subclass", together with the "Class", the "Classes").

68.     Excluded from the Classes are Defendants' officers and directors, and any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Classes are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

69.     Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Classes meets the criteria for certification Fed. R. Civ. P. Rule 23.

70.     Numerosity, Fed. R. Civ. P. 23(a)(1): The Members of the Classes are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiff at this time, but the number class members are believed to be in the millions.

71.     Commonality. As required by Fed. R. Civ. P. 23(a)(2) and (b)(3), there are questions of law and fact common to the Classes, which predominate over any questions affecting

only individual Class Members. These common questions of law and fact include, without limitation:

      a.      Whether all or some of the Utility Admin Fees are provided for by Defendants' Form Lease;

      b.      Whether Defendants' assessment of Utility Admin Fees was unfair, deceptive, or misleading; and

      c.      Whether it is Greystar's policy to charge as many Utility Admin Fees as possible regardless of the terms of Greystar's Form Lease.

72.    <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because Plaintiff was charged Utility Admin Fees and Plaintiff's lease agreement is substantively identical to that of other Class Members.

73.    <u>Adequacy of Representation</u>, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Members of the Classes. Plaintiff's counsel is competent and experienced in litigating class actions, including consumer protection litigation of this kind.

74.    <u>Predominance</u>, Fed. R. Civ. P. 23(b)(3): Greystar has engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff and Class Members all had substantively identical lease agreements and were charged illegal Utility Admin Fees. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

75.    <u>Superiority</u>, Fed. R. Civ. P. 23(b)(3): A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common

questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Greystar. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

76.     Particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

   a.     Whether all or some of the Utility Admin Fees are provided for by Defendants' Form Lease;

   b.     Whether Defendants' assessment of Utility Admin Fees was unfair, deceptive, or misleading; and

   c.     Whether it is Greystar's policy to charge as many Utility Admin Fees as possible regardless of the terms of Greystar's Form Lease.

77.     Finally, all members of the proposed Classes are readily ascertainable. Greystar has access to Class Members' names and addresses through Defendants' lease agreements with Class Members.

## CAUSES OF ACTION

### First Count
### Money Had and Received
### (On Behalf of Plaintiff and the Class)

78.    Plaintiff realleges the above allegations as if fully set forth herein. Plaintiff brings this claim individually and on behalf of all Class Members.

79.    Defendants hold money that, in equity and good conscience, belongs to Plaintiff and Class Members.

80.    Defendant GREP Texas directly received and holds money that, in equity and good conscience, belongs to Plaintiff and Class Members.

81.    Plaintiff and Class Members conferred a monetary benefit on Greystar by remitting monies for Utility Admin Fees not provided for by the parties' Form Lease and never disclosed to Plaintiff and Class Members prior to their entering into a lease agreement with Defendants. In exchange for this monetary benefit, Defendants conferred no benefit upon Plaintiff and Class Members above what Plaintiff and Class Members were already entitled to under their lease agreements with Greystar.

82.    Defendants knew that Plaintiff and Class Members conferred a benefit upon Defendants and which Defendants accepted.

83.    Under the principles of equity and good conscience, Defendants should not be permitted to retain monies belonging to Plaintiff and Class Members.

84.    Alternatively, Plaintiff and Class Members have no adequate remedy at law.

85.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer damages.

24

86.     Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to return the amounts that Plaintiff and Class Members overpaid to Defendants.

**<u>Second Count</u>**
**Violations of the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41, *et seq.***
**(On Behalf of Plaintiff and the Texas Subclass)**

87.     Plaintiff realleges the above allegations as if fully set forth herein.

88.     Plaintiff and each Texas Subclass Member is a "consumer" as defined by the DTPA.

89.     Greystar has, in the course and scope of trade and commerce, engaged in false, misleading, and deceptive acts and practices declared unlawful in section 17.46(a) of the DTPA.

90.     Greystar has engaged in false, misleading, and deceptive acts and practices declared unlawful in section 17.46(b) of the DTPA, including but not limited to:

    a.     representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law (17.46(b)(12)); and

    b.     failing to disclose information concerning goods or services which was known at the time of the transaction where such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed (17.46(b)(24)).

91.     Greystar has engaged in false, misleading, and deceptive acts and practices by charging Plaintiff and the Texas Subclass Utility Admin Fees not provided for by their respective lease agreements with Greystar.

92.    Greystar has engaged in false, misleading, and deceptive acts and practices by representing in its initial lease bills and afterwards that many (if not all) of the Utility Admin Fees that it billed to Plaintiff and the Texas Subclass were provided for or authorized by Plaintiff's and the Texas Subclass Members' respective lease agreements with Greystar.

93.    Greystar has engaged in false, misleading, and deceptive acts and practices by entering into lease agreements with Plaintiff and the Texas Subclass that Greystar, at the time of their consummation, intended to breach by later charging Utility Admin Fees regardless of whether they were provided for by Greystar's respective lease agreements with consumers. Had Plaintiff and Texas Subclass Members known that Greystar intended to breach their lease agreements by later charging unauthorized Utility Admin Fees, Plaintiff and Texas Subclass Members would not have entered into those lease agreements.

94.    Greystar has taken advantage of consumers' lack of knowledge, ability, experience, and capacity to a grossly unfair degree and to the consumers' detriment and, thus, engaged in an unconscionable course of action, under section 17.50(a)(3) of the DTPA, by:

a.    representing in its initial lease bills and afterwards that many (if not all) of the Utility Admin Fees that it billed to Plaintiff and the Texas Subclass were provided for or authorized by Plaintiff's and Texas Subclass Members' respective lease agreements with Greystar;

b.    entering into lease agreements with Plaintiff and the Texas Subclass that Greystar, at the time of their consummation, intended to breach by later charging Utility Admin Fees not provided for by Greystar's respective lease agreements with consumers;

    c.      taking advantage in the disparity of knowledge, ability, experience, and capacity between Greystar (a family of sophisticated property management companies managing over a billion dollars in assets) and consumers who lack the knowledge, ability, experience, and capacity to understand complex and lengthy leasing agreements;[15] and

    d.      taking advantage in the disparity of knowledge, ability, experience, and capacity between Greystar (a family of sophisticated property management companies managing over a billion dollars in assets) and consumers who lack the knowledge, ability, experience, and capacity to cross reference their lease bills with their lease agreements to ensure that every line item of their lease bill is authorized by their lease agreement.[16]

95.    Greystar's false, misleading, and deceptive acts and practices have caused Plaintiff's and Texas Subclass Members' the economic damages, harms, and mental anguish complained of herein.

96.    Plaintiff and Texas Subclass Members have relied to their detriment on Defendants' false, misleading, and deceptive acts and practices.

97.    Were it not for Defendants' false, misleading, and deceptive acts and practices, Plaintiff and Texas Subclass Members would not have entered into their respective lease

---

[15] https://blog.adobe.com/en/publish/2025/02/04/top-5-takeaways-from-new-contracts-survey-most-people-sign-before-they-read (Adobe study reveals "70% of consumers admit to signing contracts without knowing what's in the." "63 percent of technology leaders [report] difficulty interpreting contracts….") (last accessed Feb. 6, 2025); https://contracts.jotwell.com/reading-fine-print-actually-worse-consumers-case-unenforceable-terms/ ("Formal research confirms that few consumers pay attention to fine print and that disclosures are poorly designed and too abundant to be effective.") (last accessed Feb. 6, 2025).

[16] *Id.*; https://www.esource.com/email/ENEWS/2016/Billing ("research found that only 17 percent of customers feel that they have a very good understanding of their [utility] bill") (last accessed Feb. 6, 2025).

agreements with Defendants or paid Defendants for the illegal Utility Admin Fees not authorized by their respective lease agreements.

98.    As a result of Defendants' false, misleading, and deceptive acts and practices, Plaintiff seeks treble damages, equitable relief, prejudgment interests, costs, and reasonable and necessary attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a) For an Order certifying this action as a class action and appointing Plaintiff and their counsel to represent the Class;

b) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

c) For an award of actual damages, compensatory damages, nominal damages, and treble damages, in an amount to be determined and as allowable by law;

d) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

e) Pre- and post-judgment interest on any amounts awarded; and

f) Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.


Dated: May 2, 2025                                Respectfully submitted,

                                                 */s/ Gary E. Mason*
                                                 Gary E. Mason*
                                                 Ra O. Amen*
                                                 **MASON LLP**
                                                 5335 Wisconsin Avenue, NW, Suite 640

Washington, DC 20015
Tel: (202) 429-2290
gmason@masonllp.com
ramen@masonllp.com

Gary M. Klinger*
Alexander E. Wolf (Tex. Bar No. 24134558)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com
awolf@milberg.com

Jarrett L. Ellzey
(Tex. Bar No. 24040864)
W. Craft Hughes
(Tex. Bar No. 240404613)
Leigh Montgomery
(Tex. Bar No. 24052214)
**HUGHES ELLZEY, LLP**
1105 Milford Street
Houston, TX 77066
Tel.: (713) 554-2377
Fax: (888) 995-3335
jarrett@hughesellzey.com
craft@hughesellzey.com
leigh@hughesellzey.com

*Counsel for Plaintiff and the putative class*

*\*pro hac vice or application to be filed*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 2, 2025, a true and correct copy of the foregoing document was filed electronically via the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Gary E. Mason*
Gary E. Mason